UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORI POLLOCK,<br><br>          Plaintiff**,**<br><br>     v.<br><br>DERMOT SHEA, Individually and in His<br>Official Capacity as Police Commissioner<br>and, CITY OF NEW YORK, a municipal<br>entity,<br>          Defendants | **Civil Action No. 20-cv-6273 (JGK)**<br><br>**SECOND AMENDED COMPLAINT** |

## I. Preliminary Statement

1.      This is an employment related civil rights action against the Defendant parties, individually and collectively, for violation of Plaintiff's guaranteed constitutional right to equal terms and conditions of employment.

2.      The New York City Police Department, Plaintiff's employer, and Police Commissioner Dermot Shea, individually, and as the final policy maker for this agency, engage in practices and actions which deny to senior female uniformed police managers the same advancement and opportunities for advancement as males.

3.      In other words, these defendants have created a "glass ceiling" or barrier to advancement for women like Pollock to senior management levels within the New York City Police Department.

4.      In addition, these defendants demoted the plaintiff to the position of Chief of Collaborative Policing in December of 2019.

5.      The Plaintiff seeks monetary damages for constitutional violations and the treatment and conduct complained of in this action which has caused her the loss of advancement and opportunities in employment; loss of pay, benefits and pension;

1

extreme stress; humiliation; embarrassment, mental anguish; and damage to her reputation for which she seeks relief as deemed appropriate to serve the interests of justice and assure that her remedy is full and complete.

## II. Jurisdiction and Venue

6.      Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331 and 1343 (a) and pursuant to 42 USC § 2000(e), et. seq. and Title VII of the Civil Rights Act of 1964, as amended.(Title VII).

7.      Plaintiff also seeks the pendent/supplemental jurisdiction of this Court, pursuant to 28 USC §1367 in conjunction with the laws of the City of New York under the Human Rights Law.

8.      The value of the rights in question is in excess of $100,000.00 exclusive of interest and costs.

9.      The Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et. seq., this being an action in which the Plaintiff, while seeking monetary damages, also seeks declaratory and injunctive relief if such is deemed necessary and desirable and in the interest of justice in order to provide the Plaintiff with a full and complete remedy for the violation of her rights.

### III. Jury Trial Demanded

10.     Plaintiff demands a trial by jury on each and every one of her claims as set for the below.

### IV. Condition Precedent to Filing a Title VII Claim

11.     Plaintiff satisfied the condition precedent to filing a Title VII claim by filing an administrative charge with the United States Equal Employment Opportunity Commission under charge no. 520101004830 on or about August 8, 2020.

12.     On November 3, 2020, Pollock received a right to sue letter from the U.S. Department of Justice Civil Rights Division advising her of her right to file suit within 90 days. (Attached addendum)

13.     Thus, the filing of this amended complaint adding claims pursuant to Title VII is timely.

### V. Parties

14.     The Plaintiff is a resident of New York County and a white female formerly employed by the New York City Police Department as a uniformed member of the service with the rank of three-star Chief.

15.     City of New York is a municipal corporation with its principal office located in New York County.

16.     Dermot Shea, at all times relevant, was the police commissioner of the New York City Police Department and a final policy maker for the New York City Police Department.

17.     Shea derives his authority, funding and power from the City of New York.

18.     The reference to "all defendants" in this complaint means the City of New York and Shea, in his individual and official capacity, unless otherwise stated.

## VI. Relevant Facts

19.     Lori Pollock [Pollock] is a former, female, New York City Police Department Chief, having attained a three-star rank and designation in or about April of 2018

20.     Pollock is a citizen of the United States and a resident of the State of New York, City of New York, New York County.

21.     Pollock began her police service in or about April 28, 1987.

22.     During her police career she obtained a Bachelor of Science degree through Empire State College/SUNY 2000 and her masters-of- arts degree from John Jay College of Criminal Justice in 2019.

23.     During her police career, Pollock has received numerous awards, commendations and various invitations to speak at public events, including a commencement address to graduates at John Jay College of Criminal Justice in 2019, and a violent crime symposium hosted by the Home Office in London, England, .

24.     After 7 years, Pollock attained the rank of sergeant through a competitive civil service testing process on or about July 1994.

25.     After 10 years, Pollock attained the rank of lieutenant through a competitive civil service testing process on or about November 1997.

26.     After 14 years, Pollock attained the rank of captain through a competitive civil service testing process on or about July 2001.

27.     While employed in these management positions between July 1994-July 2001, Pollock gained operational experience necessary to serve as an effective department executive in field training, patrol, integrity control, internal investigations, police involved shooting investigations,  community policing, undercover operations and all operations related to patrol duties and responsibilities.

28.     In 2001, as a newly promoted Captain, Pollock was assigned as the Executive Officer of PSA-7 which covers uniformed and plain clothes patrol operations in public housing developments in the south Bronx.

29.     On September 11, 2001 through October 2001, Pollock was assigned to supervise security at the inner perimeter of Ground Zero following the deadly terrorist attack on the World Trade Center.

30.     Starting October 2001 through 2018, for seventeen years, Pollock gained unmatched executive experience supervising investigations involving homicides, conspiracies, gun trafficking, narcotics trafficking, internal corruption investigations, police impersonations and applicant background investigations as detailed below.

31.     In October 2001, Pollock was assigned to the Manhattan South Narcotics Division, as a group Captain under the Organized Crime Control Bureau and supervised narcotics enforcement investigations, including, but not limited to, street level buy and bust operations, search warrants and drug related conspiracy cases.

32.     In this role, she supervised approximately 100 undercovers, investigators and supervisors in enforcement actions against illegal narcotics trafficking operations in lower Manhattan.

33.     In 2007, Pollock became the executive officer of Brooklyn North Narcotics and was, thereafter, promoted to Deputy Inspector, after 20 years of service.

34.     In her role as a Deputy Inspector in Brooklyn North Narcotics, she was second in command and supervised and coordinated over 250 officers, detectives and their supervisors in enforcement actions involving narcotics and gun related investigations.

35.     In this assignment, her strategic initiatives and leadership contributed to a reduction in violence in the high crime neighborhoods under her purview.

36.     Thereafter, in 2011, Pollock was appointed as Commanding Officer of Manhattan North Narcotics, and one month later promoted to the rank of Inspector, after 24 years of service.

37.     In this role, Pollock strategically deployed over 200 under covers, detectives and supervisors to dismantle and address violent narcotic gangs and other criminal organizations involved in narcotics distribution, gun trafficking and gun violence.

38.     Pollock and the officers she supervised were extremely successful in these dangerous and challenging assignments.

39.     This was accomplished, in part, through Pollock's dedicated and knowledgeable leadership and experience in the deployment of investigatory tools, street buys, confidential informants, search warrants, wire taps and successful prosecutions in both state and federal court.

40.     After being promoted to Deputy Chief in 2014, Pollock served as the Commanding Officer, Special Operations, Internal Affairs until February 2016.

41.     During this period of time, she supervised and coordinated the efforts of the Internal Affairs Bureau's operational support units which functioned on a 24/7 operational schedule.

42.     Pollock was responsible for overseeing serious police misconduct investigations, including those investigations involving the highest-ranking officers within the police department.

43.     In this role, Pollock was also involved with integrity testing throughout the department, command center operations, training, and surveillance to confront and minimize corruption.

44.     From February 2016 until February 2017, Pollock was appointed to serve as the inaugural Investigative Chief of Detective Borough Manhattan North.

45.     This was a newly created position by then Police Commissioner James O'Neill which incorporated under one unified Manhattan North command structure all narcotic units, gang units, detective units, and homicide units.

46.     In this role, Pollock commanded approximately 450 members of the department assigned to investigatory duties.

47.     Pollock was responsible for thousands of criminal investigations involving homicides, shootings, narcotic trafficking, gun trafficking, robberies, burglaries, and many investigations designed to combat the opioid epidemic including groundbreaking federal prosecutions of opioid dealers.

48.     From February 2017 until April 2018, Pollock served as the Deputy Chief, Commanding Officer of the Candidate Assessment Division, responsible for the operations, processes and procedures relating to background investigations and

assessments of over 20,000 candidates annually for employment as police officers, school safety officers, traffic agents and police communication technicians (911 dispatchers).

49.     During this period of time, Pollock introduced greater efficiencies throughout the division to process candidates through the required medical, character, physical and psychological screenings.

50.     On or about April 18, 2018, after 31 years of service, Pollock was promoted to the rank of three-star Chief by then Police Commissioner James O'Neill.

51.     From April 2018 until July 2020 Pollock served as a three-star Chief, one of only 5 women in the NYPD's 175-year history to hold this rank.

52.     On or about April 18, 2018, Pollock served as the Chief of Crime Control Strategies in charge of developing and implementing cutting edge, efficient and effective strategies to suppress crime, achieving the lowest number of indexed crimes in the modern era, and contributing to making NYC the safest big city in America.

53.     During this time, Pollock was Co-Chair of the highly publicized weekly Compstat meetings, ensuring leader accountability through data driven policing for deployment, crime conditions, investigations and outcomes.

54.     Pollock served as a key member of the Police Commissioner's Executive Staff, responsible for weekly crime and deployment briefings, briefing the press, city executives, including the Mayor of the City of New York, and the public at large on all matters pertaining to public safety

55.     Pollock was the spokesperson for the police department for crime strategies, statistics and data driven tactics.

56.     Pollock also oversaw a team of data scientists and 100 crime analysts deployed throughout the city to expand the use of the science of crime analysis within the police department.

57.     In total, as the Chief of Crime Control Strategies, Pollock was responsible for more than 300 key personnel under her direct command, including one inspector, one deputy inspector, lieutenants, sergeants, detectives, and police officers.

58.     In addition, as the Chief of Crime Control Strategies, Pollock had citywide jurisdiction over the development of initiatives and deployment of personnel to address crime and crime patterns within the city.

59.     Pollock interacted regularly with community leaders and elected officials to initiate and implement these initiatives and address concerns regarding crime patterns throughout the city.

60.     Pollock implemented and supervised the development of unique data analytics and artificial intelligence programs to identify crime patterns.

61.     Pollock participated in a then existing multi-agency effort to address the opioid crisis.

62.     Pollock has always performed her duties and functions as a member of the New York City Police Department (NYPD) in an exemplary manner and she is a highly dedicated and loyal public servant.

63.     However, Pollock, because of her gender has not been able to advance her career in the same manner and to the same extent that a male has been able to do within the department.

64.     As more specifically stated below, the inability of women like Pollock to advance to the most prestigious executive positions within the NYPD is due to the gender based and long-standing "glass ceiling" pattern and practice within the NYPD which inhibits, prohibits and denies career advancement to women executives within the NYPD.

65.     As a result, qualified women executives are forced to retire given the totality of the circumstances which amount to working conditions so intolerable, difficult, and unpleasant that a reasonable person would feel compelled to leave her employment [paragraphs 198-274 below].

**The NYPD Advancement Process**
**The Objective Written Process**

66.     Promotion to the rank of Sergeant, Lieutenant, and Captain is accomplished through an objective civil service promotional examination administered by Department of Citywide Administrative Services (DCAS).

67.     The objective process involves the publication, posting and distribution of announcements in printed publications and prominent locations, notifying all eligible uniformed members of the date of the written examination, the subjects to be covered on the examination, eligibility requirements and the passing grade.

68.     For example, to be eligible for promotion to the rank of sergeant, you are notified that you must have served permanently in the rank of Police Officer for at least five years and have successfully completed the probationary period for the rank of police officer and attained a specified number of college credits, among other requirements.

69.     All uniformed members meeting the eligibility requirements are eligible to compete for promotion through the written testing process.

70.     All candidates who pass each promotional examination are placed on a civil service list in order of grade, highest to lowest.

71.     Each promotional list is made available to the public listing each passing uniformed officer by name and grade score.

72.     Everyone passing the written examination is eligible for promotion subject to verification that the candidate has met all the promotional requirements.

73.     Given the objective nature of the promotional process from police officer to captain, women can compete fairly for promotion within these ranks.

**The Subjective Discretionary Advancement Process**

74.     After promotion to the rank of captain, advancement to the rank of deputy inspector, inspector, deputy chief, assistant chief, and chief is at the discretion of the police commissioner.

75.     The Police Commissioner does not rely on objective selection criteria.

76.     The Police Commissioner does not rely on an objective selection process.

77.     The Police Commissioner does not publicize the requirements for the position of First Deputy Commissioner, Chief of the Department, Chief of Patrol, and Chief of Detectives.

78.     The Police Commissioner does not provide any opportunity for women executive managers in the rank of three-star chief to interview and compete for these positions thereby denying to each of them, including Pollock, the opportunity to be promoted and advance their careers.

79.     The Police Commissioner does not rely upon any input from the Office of Equity and Inclusion to ensure equity and diversity within the selection process.

80.     On the official NYPD website, the Office of Equity and Inclusion states its mission as follows: "[it] reaches beyond the mere presence of diversity, instead ensuring that employees' unique identities and experiences are valued, welcomed, and leveraged. Our commitment to an equitable and inclusive work environment where employees are engaged, valued and have opportunities will have a direct impact on how our employees interact with the diverse communities we serve."

81.     In the 175-year history of the NYPD, women have never had an opportunity, like men, to compete for the highest-ranking leadership positions within the NYPD, specifically, Police Commissioner, First Deputy Police Commissioner, Chief of Department, Chief of Patrol and Chief of Detectives.

82.     An objective examination of the "Department Allocation Ethnic Rank Report" prepared by the Personnel Bureau-Strategic Analysis Unit, Monday, July 13, 2020 indicates that the advancement of women within the uniform ranks of the department is not independent of gender.

83.     In other words, an examination of the above noted objective data, as of July 13, 2020, indicates that women are less likely than men to advance to higher uniform ranks.

84.     Likewise, an examination of the above noted objective data indicates that women are less likely than men to hold ranks of Deputy Inspector through Chief.

85.     In fact, as of the date of Pollock's involuntary retirement in August 2020, only 5 women have ever been promoted to the rank of three-star chief in the history of the New York City Police Department, despite hundreds of openings in this rank.

86.     In comparison, as of the date of Pollock's involuntary retirement in August 2020, hundreds of men have been promoted to the rank of three-star chief in the history of the New York City Police Department.

87.     In addition, never have more than 3 women served at any one time in the rank of three-star chief in the history of the New York City Police Department.

88.     In comparison, at least 10 or more men have served in the rank of three-star chief at any one time.

**Relevant Facts**

89.     In November 2019 Pollock participated in a transition meeting involving the newly appointed police commissioner Dermot Shea.

90.     In attendance at this meeting, were the highest-ranking executives within the NYPD.

91.     Pollock had been advised before-hand to prepare a presentation for newly appointed police commissioner Shea to highlight her present duties and responsibilities as Chief of the Bureau of Crime Control Strategies and the future of this bureau within the Department.

92.     During Pollock's presentation, Shea's disregard for the input of women managers, such as Pollock, was readily apparent because he was distracted looking at his telephone for most of Pollock's presentation.

93.     In other words what Pollock had to say at this meeting was discounted by Shea.

94.     At the conclusion of this meeting, Pollock was asked if she had anything additional to add and she stated: "I would like to be considered for the Chief of Detectives."

95.     This was the position Shea vacated after being appointed to the position of Police Commissioner in December 2019.

96.     Pollock was more than qualified for promotion to Chief of Detectives.

97.     For men serving in the position of Chief of Crime Control Strategies or as it was previously known the Deputy Commissioner of Operations, it is a stepping-stone to career advancement.

98.     For example, Shea initially served as Deputy Commissioner of Operations (2014) which transitioned into the Bureau of Crime Control Strategies.

99.     After serving as the Chief of Crime Control Strategies, Shea advanced to the position of Chief of Detectives and then Police Commissioner.

100.    Phil Pulaski served as Deputy Commissioner of Operations (before it was known as Crime Control Strategies) and advanced to Chief of Detectives in 2009.

101.    Pollock was never even given the opportunity by Shea to advance from her position in Crime Control Strategies, unlike men who held this title.

102.    The positions of Police Commissioner, First Deputy Commissioner, Chief of Department, Chief of Patrol and Chief of Detectives have more authority, prestige and benefits than the three-star rank to which Pollock was appointed.

103.    In addition, the Chief of Department [ as a four-star chief] earns more salary than a three-star chief.

104.    Pollock had a reasonable expectation that she would advance from her position as Chief of Crime Control Strategies in authority and prestige to one of the above noted positions given her extensive qualifications and years of operational and command experience and leadership.

105.    This reasonable expectation was based also on the fact that Phil Pulaski and Dermot Shea, both uniformed members of the police department as three-star chiefs, both advanced from the position of Chief of Crime Control Strategies to Chief of Detectives.

106.    As of August 2020, a qualified woman had never been promoted to the position of Police Commissioner, First Deputy Commissioner, Chief of Department, Chief of Patrol and Chief of Detectives.

### The December 2019 Demotion

107.    On December 6, 2019, Pollock was called to a meeting with Shea and advised there would be some changes.

108.    Shea stated to Pollock that he thought she was "valuable."

109.    He also further stated that Susan Herman was very intelligent.

110.    Shea advised that Pollock would be moved to Chief of Collaborative Policing, a position previously held by a civilian, Susan Herman, who reported directly to the police commissioner.

111.    He also stated he was bringing Chauncey Parker on board.

112.   Parker was a civilian who had applied for the position of Chief of Collaborative Policing.

113.   That position had been vacant for at least 11 months because, in fact, it was considered marginally important to operations, at best.

114.   Shea advised Pollock he wanted her to work on youth strategy "with" assistant commissioner Kevin O'Connor (SMART Unit Detective Bureau), Nilda Hoffman (3-star Chief Community Affairs) and Parker.

115.   On Monday, December 9, 2020 a department wide email was transmitted by Shea in which he revealed the formation of a new Bureau of Community Partnerships (BCP).

116.   This email also revealed to Pollock for the first time that Shea selected Parker as the Deputy Commissioner in charge of this newly organized Bureau

117.   In his role as Deputy Commissioner of BCP, Parker was appointed by Shea to manage and supervise three subordinate commands, Community Affairs (Hoffman), Collaborative Policing (Pollock), and Youth Strategies (O'Connor).

118.   None of the organizational changes publicly disclosed in the email by Shea were discussed with Pollock in her meeting with Shea on December 6 when he told her there would be "some" changes.

119.   Parker was not and never was a member of the NYPD.

120.   In sum, by this re-organization process, Shea demoted Pollock, a female 3-star chief, to a role subordinate to Parker, a male, civilian whose prior experience and qualifications are unrelated to police operations and management

121.    This is a starkly different career trajectory for Pollock as compared to her male predecessors who had the title of Chief of Crime Control Strategies or Deputy Commissioner of Operations.

122.    Pollock was far more qualified than Parker to lead BCP.

123.    In assigning Pollock as Chief of Collaborative Policing subordinate to Parker, Shea removed Pollock's authority, staff and management responsibilities from her.

124.    By so doing, Shea subjected Pollock to materially adverse terms and conditions of employment.

125.    This adverse treatment was based upon gender.

126.    In fact, Shea completely disrespected, discounted and disparaged Pollock because of her gender in this process by deliberately failing to include her in any discussions involving the re-organization.

127.    Shea completely disrespected, discounted and disparaged Pollock because of her gender because he did not seek or consider her input regarding the re-organization.

128.    Shea completely disrespected, discounted and disparaged Pollock because of her gender because he did not seek her input into the selection process.

129.    Shea completely disrespected, discounted and disparaged Pollock because of her gender because he did not offer her the opportunity to interview for the position to lead BCP or Chief of Detectives.

130.    The selection of Parker by Shea was gender based.

131.   In addition, other qualified women were never offered the opportunity to compete or interview to lead BCP

132.   On Monday, December 9, 2019, Pollock had a meeting with Parker, her new direct report.

133.   Pollock expressed her anger about her adverse gender based treatment by Shea to Parker by stating; "first I get dumped to this position and then you tell me you are my supervisor and don't you think that is a kick in my teeth?"

134.   On the same day, Pollock was summoned to a meeting in the police commissioner's executive conference room to learn that there would be a promotion ceremony conducted by Shea to install his new promotees.

135.   Present at this ceremony were more than 30 of the top executives in the NYPD.

136.   Pollock was not advised in advance about the purpose of this meeting.

137.   Normally, the top executives in the Department sit according to rank, title and authority at these events.

138.   Previously in her position as Chief of Crime Control Strategies, Pollock sat three seats removed from the commissioner at all meetings conducted in the executive conference room.

139.   On this day, and given her demotion by Shea, Pollock sat on the other end of the table from where she normally sat and at a distance from the police commissioner.

140.   During the meeting, and in front of the entire executive staff, Shea shouted to Pollock and stated: "Hey Lori how do you like it at the other end of the table?"

141.    This remark was disrespectful, disparaging and denigrating, by design.

142.    By this remark, Shea also showed his absolute disregard for his adverse treatment of Pollock.

143.    On December 9, 2019, after the ceremony, Pollock went to speak with Deputy Commissioner Vincent Grippo, chief of staff to the police commissioner, to complain about her treatment.

144.    On December 10, 2019, Pollock met with Parker and during this meeting Parker requested that Pollock assist him with obtaining: (a) drawings for his new office; (b) a telephone and (c) personnel.

145.    This type of request is based upon gender-based stereotyping prevalent in the NYPD about the role and capabilities of women within the police department.

146.    Parker would have never requested that a three-star male Chief within the NYPD perform clerical duties for him.

147.    On December 23, 2019, Pollock made an appointment to speak with Shea to request that he re-consider her assignment.

148.    Shea requested that Pollock give him 30 days.

149.    Pollock heard nothing further from Shea.

150.    Pollock made another appointment with Shea, on February 24, 2020.

151.    At this meeting Pollock advised Shea that she was going to the pension section on March 2 for separation from service by the end of March.

152.    Shea then stated, in sum and substance, he would not accept her resignation.

153.    He acknowledged that he said he would get back to her but there has been little movement.

154.    Shea acknowledged that "structurally [her] transfer was wrong."

155.    And despite giving every opportunity to Shea to correct his blatant gender based adverse treatment of Pollock, Shea failed to do so.

156.    Because of her gender, Shea never considered Pollock for any of the highest-ranking leaderships positions in his administration.

157.    Shea, like other male commissioners before him, exercised his discretion in a gender-based way which has prevented the advancement of women and, in fact, perpetuated a "glass ceiling" for women seeking the highest leadership positions in the NYPD.

158.    In other words, because of her gender, Pollock was unable to advance her career like her male counterparts to the highest leadership positions in the department.

159.    The highest leadership positions in the NYPD are Police Commissioner, First Deputy Commissioner, Chief of Department, Chief of Patrol, and Chief of Detectives,.

160.    Each of these ranks is afforded greater staffing, authority, prestige, and benefits than what Pollock was experiencing as a three-star chief.

161.    Shea did not consider or select any of the highly qualified female police chiefs for positions that became available in his administration which included, Deputy Commissioner of Bureau of Community Partnerships, Chief of Crime Control Strategies, Chief of Detectives, Chief of Patrol, Chief of Operations, or Chief of Housing.

162.   A Police Commissioner has never promoted a woman to serve as Chief of Patrol in the 175-year history of the NYPD

163.   A Police Commissioner has never promoted a woman to serve as Chief of Detectives in the 175-year history of the NYPD.

164.   A Police Commissioner has never promoted a woman to serve as Chief of Department in the 175-year history of the NYPD.

165.   Pollock was the first and only woman to serve as Chief of Crime Control Strategies.

166.   A woman has never been appointed to serve as Police Commissioner in the 175-year history of the NYPD.

167.   Unlike Pollock, and because of his gender, Rodney Harrison was able to advance from Captain to Chief of Patrol.

168.   Unlike Pollock, and because of his gender, Shea promoted Rodney Harrison on December 20, 2019 to Chief of Detectives.

169.   Pollock was never even offered an interview for promotion to Chief of Detectives, despite expressing to Shea at a transition meeting on November 20, 2019 that she would like to be considered for the position.

170.   Unlike other qualified women, and because of his gender, Shea promoted Raymond Spinella, on July 22, 2020 to Chief of Operations without, based upon information and belief, affording any qualified women the opportunity to interview for the job.

171.   Unlike Pollock and because of his gender, Shea promoted Fausto B. Pichardo to Chief of Patrol Services.

172.    Based upon information and belief, other qualified women were never offered the opportunity to interview for this position.

173.    Pollock was never even offered an interview for promotion to Chief of Patrol despite expressing to Shea she would like to advance her career.

174.    Because of his gender, Shea promoted Michael LiPetri to Chief of Crime Control Strategies on December 18, 2019 without, based upon information and belief, affording any qualified women the opportunity to interview for the job.

175.    Because of his gender, Shea promoted Dave Barrere to Chief of Housing Police without, based upon information and belief, affording any qualified women like Pollock the opportunity to interview for the job.

176.    It became apparent to Pollock that Shea would never offer her any career advancement or opportunities within the NYPD, despite his assurances and promises to do so on more than one occasion.

177.    Effective August 6, 2020, Pollock chose to leave her police career finding she had no alternative because it was more than clear to her that she could not advance her career.

178.    Significantly, it was more than clear to Pollock that despite every opportunity she had given Shea to correct his adverse treatment of her by demoting her, Shea was not going to do so.

179.    Thus, Shea deliberately and intentionally created working conditions so intolerable, difficult, or unpleasant for Pollock that a reasonable person in her position would have felt compelled to leave her employment.

**Commissioner Shea is the Final Policy Maker of the NYPD**

180.   The City Charter, Chapter 18, Section 434, provides that the police commissioner "shall be the chief executive officer of the police force. He shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."

181.   As the final policy-maker, Shea deliberately implemented, condoned, sanctioned and ratified a "glass ceiling" policy and practice within the NYPD which excluded qualified women, like Pollock, from advancing to the highest ranking uniform leadership positions in the department thereby depriving women, like Pollock, of an equal opportunity, as compared to their male counterparts, to advance their careers, their earning capacity, pension and benefits.

182.   As a result, Pollock was denied advancement and opportunities to advance based upon her gender because of the "glass ceiling" policy and practice.

183.   Pollock, as a female member of the NYPD, had a constitutional right to be treated equally as compared to her male counterparts in advancements and opportunities to advance her police career.

184.   As the official with final policy-making authority, Shea deliberately and intentionally perpetuated the "glass ceiling" policy and practice on behalf of the City of New York by demoting Pollock in her duties, responsibilities and authority.

185.   As a result, Pollock was demoted by Shea based upon her gender because of the "glass ceiling" policy and practice

186.    Shea knew or reasonably should have known that women must be advanced at the same rate and in the same manner as males within the uniform ranks of the department.

187.    Shea knew or reasonably should have known that women must be afforded equal opportunities for advancement within the uniform ranks of the NYPD.

188.    In fact, Shea had an affirmative obligation to ensure that all qualified women were afforded equal opportunities to advance their careers within the uniform ranks of the NYPD.

189.    Shea, despite his knowledge of his affirmative obligations as noted above, failed to treat Pollock equally to her male counterparts in the terms and conditions of her employment including career advancement and opportunities for advancement within the uniform ranks of the department.

190.    Shea is individually responsible for this conduct.

**Facts Supporting Liability As Against The City of New York**

191.    Shea, as the final policy maker of the NYPD deliberately created, condoned, sanctioned and ratified the "glass ceiling" policy and practice on behalf of the City of New York whereby qualified women, like Pollock, are denied an equal opportunity as compared to male counterparts to advance their careers to leaderships positions within the uniform ranks of the NYPD which adversely effects their earning capacity, pension and benefits.

192.    As a result, Pollock was denied promotional opportunities based upon her gender because of the "glass ceiling" policy and practice.

193.   Shea, as the final policy maker for the NYPD, deliberately perpetuated the "glass ceiling" policy and practice on behalf of the City of New York by demoting Pollock in her duties, responsibilities and authority.

194.   As a result, Pollock was demoted based upon her gender because of the "glass ceiling" policy and practice that is pervasive within the NYPD.

195.   The City of New York is strictly liable for Shea's conduct in condoning, ratifying, and perpetuating the "glass ceiling" policy and practice.

196.   Both Shea and the City of New York had an affirmative obligation to ensure that all qualified women, like Pollock, were afforded equal advancement and equal opportunities to advance their career within all ranks of the NYPD.

197.   Both Shea and the City of New York had an affirmative obligation to ensure that all qualified women, like Pollock, were treated equally to men with respect to career opportunities and advancement.

**Facts Supporting A Claim of Constructive Discharge**

198.    After serving as Chief of Crime Control Strategies, Pollock had a reasonable expectation that she would continue to advance her career within the police department like males who served in this role before her.

199.   In addition, Pollock had a reasonable expectation she would advance within the police department given the breadth of her experience and qualifications.

200.   As promotional opportunities became available, it became increasingly apparent to Pollock over time that she would not be promoted by Shea based upon gender.

201.   For example, Pollock became aware of an opening for a Chief of

Detectives and expressed an interest in being considered for this position in a meeting with Shea on November 20, 2019.

202.   Shea promoted Rodney Harrison on December 20, 2019 to Chief of Detectives.

203.   Pollock was never even offered an interview for promotion to Chief of Detectives, despite expressing to Shea that she would like to be considered for the position.

204.   Pollock was qualified for promotion to Chief of Detectives.

205.   No woman had ever been promoted to this position in the 175-year history of the police department.

206.   It is considered a promotion to advance from Chief of Crime Control Strategies to Chief of Detectives given the breadth of authority, scope of duties and responsibilities, public exposure, notoriety of the position, and interactions with the public and press.

207.   Despite her qualifications and his obligation to ensure diversity, Shea deliberately did not promote Pollock to this position because of her gender.

208.   Based upon information and belief, Shea did not offer any qualified woman the opportunity to interview for this position.

209.   Also, Shea promoted Fausto B. Pichardo to Chief of Patrol Services in December of 2019.

210.   Pollock was qualified for promotion to Chief of Patrol Services.

211.   No woman had ever been promoted to this position in the 175-year history of the police department.

26

212. It is considered a promotion to advance from Chief of Crime Control Strategies to Chief of Patrol Services given the scope of authority, staff, duties and responsibilities involved.

213. Despite her qualifications and his obligation to ensure diversity, Shea deliberately did not promote Pollock to this position because of her gender.

214. Based upon information and belief, Shea did not offer any qualified woman the opportunity to interview for this position.

215. Also, Shea in December of 2019, Shea appointed Chauncey Parker, a male civilian, as Deputy Commissioner of the Bureau of Community Partnerships.

216. It is considered a promotion to advance from Chief of Crime Control Strategies to Deputy Commissioner of the Bureau of Community Partnerships.

217. Despite her qualifications and his obligation to ensure diversity, Shea deliberately did not promote Pollock to this position because of her gender.

218. It is considered a promotion to advance from Chief of Crime Control Strategies to Deputy Commissioner of Bureau of Community Partnerships.

219. Based upon information and belief, Shea did not offer any qualified woman the opportunity to interview for this position.

220. Also, Shea promoted Dave Barrere to Chief of Housing Police February 5, 2020, without, based upon information and belief, affording any qualified women like Pollock the opportunity to interview for the job.

221. Despite her qualifications and his obligation to ensure diversity, Shea deliberately did not promote Pollock to this position because of her gender.

222. Pollock was qualified for promotion to Chief of Housing.

223.    Only one other woman has ever been promoted to this position in the 175-year history of the police department.

224.    It is considered a promotion to advance from Chief of Collaborative Policing to Chief of Housing given the scope of authority, staff, duties and responsibilities involved.

225.    In addition, Shea promoted Raymond Spinella, on July 22, 2020 to Chief of Operations without, based upon information and belief, affording any qualified woman the opportunity to interview for the job.

226.    Pollock was qualified for promotion to this position

227.    No woman had ever been promoted to this position in the 175 history of the police department.

228.    Despite her qualifications and his obligation to ensure diversity, Shea deliberately did not promote Pollock to this position because of her gender.

229.    It is considered a promotion to advance from Chief of Collaborative Policing to Chief of Operations given the scope of authority, staff, duties and responsibilities involved.

230.    In total, it became apparent to Pollock over time that Shea would not promote any qualified woman to the above noted positions in the department as Shea filled every above position that became available with a male.

231.    As noted below, Pollock did seek redress for Shea's failure to consider her for these positions [see below paragraphs 257-271].

232.    In addition, in December of 2019, Pollock was demoted by Shea when Shea removed her from her position as the Chief of Crime Control Strategies with no

justification.

233.   Shea advised Pollock that she would be moved to a position as Chief of Collaborative Policing.

234.   In so doing, Shea significantly reduced Pollock's authority and staff.

235.   As the Chief of Collaborative Policing, the scope of work was diminished because in sum and substance this position did not involve any substantive duties and responsibilities.

236.   In fact, in or about March-April 2020, Pollock was detailed to the Office of Emergency Management given the fact she had so few duties and responsibilities as the Chief of Collaborative Policing.

237.   In effect, in structuring the Bureau of Community Partnerships (BCP), Shea demoted Pollock to a position subordinate in authority to Chauncey Parker, a male civilian and newly appointed Deputy Commissioner in the Bureau of Community Partnerships (BCP).

238.   The position of Chief of Collaborative Policing had been vacant for 11 months prior to Shea demoting Pollock to this position.

239.   This position was marginally important to police operations.

240.   According to the structure devised by Shea, the position of Chief of Collaborative Policing became a subordinate command under the leadership of the new created position of Deputy Commissioner of BCP.

241.   Also, according to the structure devised by Shea, the bureau of Community Affairs also became a subordinate command under the leadership of the newly created position of Deputy Commissioner of BCP.

242.    Nilda Hoffman, a highly qualified female, was the three-star Chief of Community Affairs at the time of this re-organization.

243.    In effect, in creating this new structure, Shea diminished the authority of Pollock and Hofmann by relegating both of them to reporting positions subordinate to Chauncey Parker, a male, as the newly hired Deputy Commissioner of BCP.

244.    In December of 2019, Shea announced the hiring of Chauncey Parker as the newly appointed Deputy Commissioner of BCP.

245.    By so doing, Shea publicly denigrated Pollock and Hoffmann's authority, rank, and prestige by placing them in a subordinate position to Chauncey Parker based upon gender.

246.    Further, in creating this new BCP, Shea transferred Kevin O'Connor, an Assistant Commissioner, to serve in a position lateral to that of Pollock and Hofmann, all reporting to Parker.

247.    By so doing, Shea publicly denigrated Pollock and Hofmann's authority, rank, and prestige as three-star chiefs, by placing them in a position comparable to an assistant commissioner.

248.    Shea, in making Chauncey Parker a Deputy Commissioner and head of BCP, deliberately and intentionally provided more authority, prestige, and benefits to Chauncy Parker than to Pollock and Hofmann based upon gender.

249.    Shea deliberately did not include Pollock or Hofmann, based upon gender, in any of the discussions that took place regarding the creation of the new BCP, the appointment of Chauncey Parker to the position, and the structure of BCP.

250.    Shea deliberately did not seek the input of Pollock and Hofmann regarding

his plans to move each of them to a position subordinate to Chauncey Parker based upon gender

251.    By and through this deliberate omission, Shea completely disrespected, discounted and disparaged Pollock and Hofmann, both senior uniformed female executives in the police department, based on gender.

252.    Also, after demoting Pollock, Shea publicly denigrated and humiliated Pollock in a meeting of senior executives [paragraphs 138-142 above].

253.    In addition, Pollock was far more qualified than Parker to lead BCP.

254.    In her prior position as the Chief of Crime Control Strategies, Pollock was responsible for more than 300 key personnel under her direct command, including one inspector, one deputy inspector, lieutenants, sergeants and police officers.

255.    In addition, as the Chief of Crime Control Strategies, Pollock had citywide jurisdiction over the development of initiatives and deployment of personnel to address crime and crime patterns within the city.

256.    The scope and breadth of Pollock's duties and authorities were greatly diminished and she was assigned no more than 9 personnel in her position as Chief of Collaborative Policing.

257.    Pollock sought redress, on at least four different occasions, for her intolerable working conditions.

258.    For example, Pollock met with Chauncey Parker on December 9, 2019 and expressed her concerns about her inappropriate discriminatory treatment.

259.    Parker reports directly to Shea and had a duty to inform Shea of this discussion and, based upon information and belief, he did so, to no avail.

260.   Pollock also met with Chief of Staff Vincent Grippo to discuss her concerns about her inappropriate discriminatory treatment.

261.   Grippo reports directly to Shea and had a duty to inform Shea of this discussion and, based upon information and belief, he did so, to no avail.

262.   Pollock directly sought redress from Shea about her inappropriate discriminatory treatment.

263.   On December 23, 2019, Pollock made an appointment and spoke with Shea to request that he re-consider her assignment to Chief of Collaborate Policing.

264.   Shea requested that Pollock give him 30 days to address her concerns.

265.   Having not heard back from Shea, 60 days later, Pollock made another appointment with Shea, on February 24, 2020.

266.   At this meeting Pollock advised Shea that she was going to the pension section on March 2 for separation from service by the end of March because of her discriminatory treatment.

267.   Shea then stated, in sum and substance, he would not accept her resignation.

268.   He acknowledged that he had previously said he would get back to her, but failed to do so.

269.   Shea acknowledged that "structurally [her] transfer was wrong."

270.   After waiting several more months, Pollock heard nothing further from Shea.

271.   Significantly, and after giving Shea more than a sufficient amount of time [8 months] to correct what he himself acknowledged was wrong, it became clear to

Pollock that her work conditions would not improve.

272.    In the aggregate, the combination of the demotion in authority and position; the diminution of duties and responsibilities; the loss of staff; the failure to be considered for promotional opportunities that were available; the failure to be included in any discussions regarding the formation of BCP and the reporting structure; and the absolute failure of Shea to redress her work conditions and the ongoing disrespect and disparagement she endured created an intolerable, unreasonable and humiliating work environment for Pollock.

273.    Thus, Shea deliberately and intentionally created working conditions so intolerable, unreasonable, humiliating, difficult, and unpleasant for Pollock that a reasonable person in her position would have felt compelled to resign from employment.

274.    Effective August 6, 2020, Pollock chose to leave her police career rather than continue to experience intolerable, unreasonable and humiliating working conditions after exhausting every avenue of redress over the course of 8 months [from December 2019 to August 2020].

## AS AND FOR A FIRST CAUSE OF ACTION:

### VIOLATION OF TITLE 8 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK BY SHEA, INDIVIDUALLY AND OFFICIALLY

275.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

276.    By his individual conduct and actions and policies, defendant Shea has individually treated plaintiff differently than her male counterparts in the advancement of her career and advancement opportunities within the uniform ranks of the department.

277.    By his individual conduct and actions and policies, defendant Shea has individually treated plaintiff differently than her male counterparts by demoting her based upon her gender.

278.    By his conduct and actions and policies, defendant Shea has individually violated the plaintiff's rights under New York City Human Rights Law based upon gender.

279.    Plaintiff has suffered injuries and damages.

**AS AND FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE 8 OF THE NEW YORK CITY ADMINISTRATIVE CODE OF THE CITY OF NEW YORK BY THE CITY OF NEW YORK AS AN EMPLOYER**

280.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

281.    Pursuant to strict liability, the City of New York is responsible for Shea's conduct and actions in treating plaintiff differently than her male counterparts in the advancement of her career and advancement opportunities within the uniform ranks of the department.

282.    Pursuant to strict liability, the City of New York is responsible for Shea's conduct and actions in treating plaintiff differently than her male counterparts by demoting her based upon her gender.

283.    Plaintiff has suffered injuries and damages.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**CONSTRUCTIVE DISCHARGE**

284.    Plaintiff repeats and incorporates by reference the paragraphs above.

285.    Plaintiff was subjected to a gender based discriminatory work environment

where women are unable to advance their careers based upon a "glass ceiling" which has been perpetuated, condoned, ratified and sanctioned by the named defendant parties in this action.

286.    That the defendant parties deliberately and intentionally demoted the plaintiff in duties, responsibilities, authority and staff to a role subordinate to a male civilian based upon gender.

287.    That this public demotion was humiliating by design based upon gender.

288.    In the aggregate, the combination of the demotion in authority and staff; the diminution of duties and responsibilities; the failure to be considered for promotional opportunities that were available; the failure of Shea to redress her work conditions and the ongoing disrespect and disparagement she endured created an intolerable, unreasonable and humiliating work environment for Pollock

289.    Thus, Shea deliberately and intentionally created working conditions so intolerable, unreasonable, humiliating, difficult, and unpleasant for Pollock that a reasonable person in her position would have felt compelled to resign from employment.

290.    As a result of the actions and conduct of the named Defendant, Plaintiff has suffered and will continue to suffer compensatory damages, including but not limited to back pay, front pay, prejudgment interest and loss of law enforcement career opportunities.

291.    As a result of the actions and conduct of the named Defendant, Plaintiff has suffered and will continue to suffer emotional distress, including extreme anxiety, depression, loss of sleep, loss of appetite, loss of reputation, humiliation, loss of employment opportunities, embarrassment and consequential damages.

<u>AS AND FOR A FOURTH CAUSE OF ACTION:</u>
**VIOLATION OF TITLE VII**
**(GENDER DISCRIMINATION IN PROMOTION AND BY DEMOTION)**

292.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

293.    By the conduct and actions and policies of defendant parties, Plaintiff was subjected to a gender based discriminatory work environment where qualified women are unable to advance their careers based upon a "glass ceiling" pattern and practice which has been perpetuated, condoned, ratified and sanctioned by the named defendant parties in this action.

294.    That the defendant parties deliberately and intentionally demoted the plaintiff in duties, responsibilities, authority and staff to a role subordinate to a male civilian based upon gender.

295.    The City of New York is strictly liable or vicariously liable for the conduct and actions of Shea as stated above.  By the conduct and actions and policies of defendant Shea, the City of New York has intentionally and deliberately treated plaintiff differently than her male counterparts by demoting her based upon her gender.

296.    The City of New York has violated plaintiff's right under Title VII, 42 USC 2000 ( e), et. seq.

297.    Plaintiff has suffered injuries and damages.

**WHEREFORE,** plaintiff demands the following relief jointly and severally against all of the defendants:

a.  Declaratory judgment stating that Defendants' practices, policies and procedures violated the equal protection rights of women, such as Pollock, within the NYPD career advancement process resulting in a violation of Title VII and Title 8 of the New York City Administrative Code, § 8-107;

b.  Injunctive relief against the Defendants and its employees and any and all persons acting in concert with them from engaging in the unlawful practices, polices and customs described in this complaint;

c.  Injunctive relief which directs Defendants and its employees and any and all persons acting in concert with them to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to effect female employees within the NYPD. Such action may include proper and independent oversight and management of the promotional process within the NYPD to ensure that women are treated equally to men;

d.  Enter judgment against Defendants on all causes of action and an award of compensatory damages, consequential, punitive and/or exemplary damages, in an amount to be determined at trial;

e.  attorneys' fees and costs, in an amount to be determined at trial;

f.  pre and post judgment interest, in an amount to be determined at trial and

g.  for further relief as this court deems just and proper.

Dated: New York, New York
      January 25, 2021                       Respectfully Submitted,

                                                Meenan & Associates, LLC
                                                Attorney for Plaintiff
                                                299 Broadway, Suite 1310
                                                New York, New York 10007
                                                P: (212) 226-7334
                                                E: cmm@meenanesqs.com

                                                Colleen M. Meenan (CM7439)