UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LORI POLLOCK,

                        Plaintiff,                    20-cv-6273 (JGK)

        - against -                                   OPINION AND ORDER

DERMOT SHEA, individually and in his
official capacity, and CITY OF NEW
YORK

                        Defendants.
_____

JOHN G. KOELTL, District Judge:

        The plaintiff, Lori Pollock, brings this action against New

York City Police Commissioner Dermot Shea and the City of New

York (the "City"), asserting claims of employment discrimination

and constructive discharge in violation of the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL")

and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.

Pollock seeks to hold Shea individually liable under the NYCHRL,

and to hold the City liable under Title VII and the NYCHRL.

        The defendants have moved to dismiss the Complaint for

failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6). For the reasons explained below, the motion

to dismiss is **granted in part and denied in part.**

                                I.

        Pollock joined the New York City Police Department ("NYPD")

in April 1987. Second Amended Complaint ("SAC"), ECF No. 26

¶ 21. Pollock had a successful career on the police force, demonstrated by a number of awards, commendations, promotions, and public speaking engagements. SAC ¶¶ 23-49. She was promoted to sergeant in July 1994, lieutenant in November 1997, and captain in July 2001. SAC ¶¶ 24-26. From 2001 until 2018, Pollock supervised a broad range of investigations and hundreds of employees. SAC ¶¶ 30-47.

In April 2018, then-Police Commissioner James O'Neill promoted Pollock to the rank of three-star chief, and selected Pollock to serve as the Chief of Crime Control Strategies. SAC ¶¶ 50, 52. In this role, Pollock was responsible for more than 300 staff members and had frequent interactions with the press, city executives, the public, community leaders, and elected officials. SAC ¶¶ 53-60. Pollock was responsible for initiatives and personnel deployment to address crime and crime patterns within the City. SAC ¶ 58.

In December 2019, Defendant Shea was appointed Police Commissioner of the NYPD. As part of Shea's transition, in a November 2019 meeting of the NYPD's highest-ranking executives, Pollock delivered a presentation about her bureau. SAC ¶¶ 89-91. Pollock alleges that Shea was distracted, looking at his cell phone for most of the presentation. SAC ¶ 92. After the meeting, Pollock informed Shea that she was interested in the Chief of

2

Detectives position that was left vacant by Shea's appointment
to Commissioner. SAC ¶¶ 94-95.

Pollock claims that the process for advancement to Chief of
Detectives is discretionary and subjective, that the
requirements for the position are not publicized, and that the
Commissioner does not provide opportunities for women—even those
with the rank of three-star chief—to compete for the position.
SAC ¶¶ 74-78. Pollock claims that she was "more than qualified"
for this promotion, and she cites two examples of men being
promoted from Chief of Crime Control Strategies (her role at the
time) to Chief of Detectives. SAC ¶¶ 96-100. Pollock alleges
that the Chief of Detectives role had more authority, prestige,
and benefits than her previous role. SAC ¶ 102.

The Chief of Detectives role went to Rodney Harrison, a
male captain, and Pollock instead was appointed the Chief of
Collaborative Policing. SAC ¶¶ 110, 167-68. Although the Chief
of Collaborative Policing previously would have reported
directly to the Commissioner, Shea reorganized the Department,
forming a new Bureau of Community Partnerships ("BCP") and
installing Chauncey Parker, a male civilian, as Deputy
Commissioner and head of BCP. SAC ¶¶ 110-12, 115-16. As a result
of the reorganization, Pollock, as Chief of Collaborative
Policing, reported to Parker, the Deputy Commissioner of BCP.
SAC ¶¶ 110, 117. Pollock alleges that she was not aware of these

organizational changes before they were publicly announced, and
that she was not given the opportunity to apply for the Deputy
Commissioner of BCP role. SAC ¶ 118, 129. Pollock alleges that,
as Chief of Collaborative Policing, she oversaw fewer staff and
had less responsibility as compared to her prior role. SAC
¶ 123. Pollock claims that these staffing decisions were
motivated by gender discrimination. SAC ¶¶ 125, 130.

Pollock further alleges that Shea was disrespectful,
disparaging, and denigrating toward her. SAC ¶¶ 92, 128-29, 140-
42. In addition to her allegations regarding the November 2019
meeting, Pollock's Complaint recounts a meeting with more than
thirty top NYPD executives during which Shea made a joke about
Pollock's placement at the table: as a result of her new role,
Pollock was seated farther from the Commissioner than she was
before the reorganization. SAC ¶¶ 134-41. Pollock also alleges
that Parker, the newly installed Deputy Commissioner of BCP,
called her into his office on one occasion to assist with
administrative matters such as obtaining telephones, personnel,
and drawings for his new office. SAC ¶ 144. Pollock alleges that
these requests were based upon gender-based stereotyping and
that Parker would not have asked a three-star male chief to
perform clerical duties for him. SAC ¶¶ 145-46.

In December 2019, Pollock met with Shea and requested that
Shea reconsider her assignment. Shea asked Pollock to "give him

4

30 days" to address her concerns, but Pollock heard nothing further from Shea. SAC ¶¶ 263-65. In February 2020, Pollock informed Shea that she intended to leave the NYPD by the end of March, and Shea replied that he would not accept her resignation. SAC ¶¶ 266-67. Shea allegedly admitted that Pollock's transfer was "structurally . . . wrong," but never considered Pollock for any of the NYPD's highest-ranking leadership positions. SAC ¶ 153-56. Believing that she no longer had any opportunities for career advancement, Pollock left the NYPD in August 2020. SAC ¶¶ 176-77.

Pollock brings this suit alleging discriminatory employment practices based on failure to promote and demotion, as well as constructive discharge, in violation of the NYCHRL and Title VII. SAC ¶¶ 275-97. Pollock brings NYCHRL claims against Shea individually and in his official capacity as the final policymaker for the NYPD, and against the City as Shea's employer. SAC ¶¶ 275-83. Pollock also brings Title VII claims against the City. SAC ¶¶ 292-97. She seeks declaratory judgment stating that the defendants' policies, practices, and procedures violate the equal protection rights of women within the NYPD career advancement process in violation of Title VII and the NYCHRL; injunctive relief directing the defendants to take affirmative actions to ensure that the alleged unlawful employment practices do not continue; compensatory,

consequential, punitive, and/or exemplary damages; attorney's fees and costs; and pre- and post-judgment interest. SAC at 37.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).[1] The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The court should not dismiss the plaintiff's complaint if the complaint includes "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

complaint is inapplicable to legal conclusions." Id. When
presented with a motion to dismiss pursuant to Rule 12(b)(6),
the court may consider documents that are referenced in the
complaint, matters of which judicial notice may be taken, and
documents either in the plaintiff's possession or of which the
plaintiff had knowledge and relied on in bringing suit. See
Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### III.

The defendants move to dismiss Pollock's employment
discrimination claims under Title VII and the NYCHRL.

Title VII makes it unlawful for an employer "to
discriminate against any individual with respect to [her]
compensation, terms, conditions, or privileges of employment,
because of such individual's . . . sex." 42 U.S.C. § 2000e-
2(a)(1). In Littlejohn v. City of N.Y., 795 F.3d 297, 307-11 (2d
Cir. 2015), the Second Circuit Court of Appeals articulated the
standard for deciding a motion to dismiss with respect to a
Title VII employment discrimination claim. In doing so, the
court had to reconcile the Supreme Court precedents establishing
the nature of a prima facie case of discrimination under Title
VII—namely, McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973) and its progeny—with the general pleading requirements
set out in Iqbal and Twombly. The court concluded that Iqbal's
pleading requirements do apply to Title VII complaints of

employment discrimination. Therefore, a Title VII complaint must allege "sufficient facts to make its claim plausible." Littlejohn, 795 F.3d at 310.

The Littlejohn court then asked what must be plausibly supported by factual allegations in a Title VII complaint, given that a Title VII plaintiff does not need substantial evidence of discriminatory intent at the initial stage of litigation under the McDonnell Douglas framework. The court concluded that, at the motion to dismiss stage, a plaintiff must make a showing: "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) [that she] can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." Id. at 311.

The Second Circuit Court of Appeals has made clear that this standard is more lenient than the traditional requirements for a prima facie case under McDonell Douglas. "[A] plaintiff is not required to plead a prima facie case under McDonnell Douglas, at least as the test was originally formulated, to defeat a motion to dismiss." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84 (2d Cir. 2015). Accordingly, Pollock's Complaint "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. [It] need only give plausible

support to a minimal inference of discriminatory motivation."
Littlejohn, 795 F.3d at 311.

It is undisputed that Pollock, as a woman, is a member of a
protected class. It is also undisputed that Pollock was
qualified for Chief of Crime Control Strategies (the position
she held before the reorganization), and for Chief of Detectives
and Deputy Commissioner of BCP (two of the appointments she
sought but did not receive).

The defendants contend that Pollock did not suffer an
adverse employment action because: (1) Pollock's failure to be
appointed Chief of Detectives was a lateral appointment denial
as opposed to a failure to promote, and (2) Pollock's
reassignment from Chief of Crime Control Strategies to Chief of
Collaborative Policing did not amount to a demotion. The
defendants also argue that Pollock has failed to plead facts
supporting an inference of discrimination.

Pollock alleges two adverse employment actions: (1) that
she was not promoted to any of several vacant positions for
which she was qualified, including Chief of Detectives and
Deputy Commissioner of BCP, and (2) that she was demoted when
she was transferred from Chief of Crime Control Strategies to
Chief of Collaborative Policing.

"An adverse employment action is a materially adverse
change in the terms and conditions of employment." Torre v.

Charter Commc'ns, Inc., 493 F. Supp. 3d 276, 286 (S.D.N.Y. 2020). It is more than a mere inconvenience or de minimis change in job responsibilities. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). A materially adverse change may be evidenced by a decrease in wage or salary, a less distinguished title, a loss of benefits, a significant reduction in material responsibilities, or other indices unique to a particular situation. See id. These examples are not exhaustive, and courts must consider the circumstances of each alleged adverse employment action to determine whether it is sufficiently material. See Torre, 493 F. Supp. 3d at 286.

With regard to Pollock's failure to promote allegation, a plaintiff must ordinarily actually apply for the desired position in order to show an adverse employment action. See Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir. 2004). However, a plaintiff may be excused from this requirement if she demonstrates that the vacancy was not posted and that the plaintiff either did not know about the vacancy or tried to apply through informal procedures endorsed by the employer. Id.; see also Fox v. Cnty. of Yates, 657 F. App'x 60, 63 (2d Cir. 2016). Here, Pollock alleges that: the process for selecting the Chief of Detectives is discretionary, the Commissioner does not rely on objective selection criteria, the job requirements are not publicized, and Pollock was not considered for Chief of

Detectives despite expressing her interest in the job to Shea directly. SAC ¶¶ 74-77, 94, 156, 169. Additionally, Pollock alleges that she was not aware of the creation of the Deputy Commissioner of BCP role until after the position was given to Parker, and that she was never given the opportunity to apply. SAC ¶¶ 29, 115-18, 249. Therefore, Pollock may pursue her failure to promote claim with respect to the Chief of Detectives and Deputy Commissioner of BCP positions even though she did not formally apply for those positions.

However, Pollock also appears to allege that she was entitled to—but did not receive—promotions to several other positions: namely, Chief of Patrol, Chief of Housing, and Chief of Operations. See ECF No. 30, at 8, 11. Pollock has not alleged that she was unaware of these vacancies or that she applied for these positions, formally or otherwise. And Pollock's allegations that she "generally requested promotion consideration" are insufficient to relieve her of the actual application requirement. Petrosino, 385 F.3d at 227; see, e.g., SAC ¶ 173 ("Pollock was never even offered an interview for promotion to Chief of Patrol despite expressing to Shea she would like to advance her career."). Thus Pollock can pursue her failure to promote claim only with respect to the Chief of Detectives and Deputy Commissioner of BCP positions, and not with respect to any other positions.

The defendants argue that Pollock was not denied a
promotion at all because an appointment to Chief of Detectives
would have been merely a lateral transfer from Pollock's prior
role as Chief of Crime Control Strategies. But Pollock has
plausibly alleged that appointment to either Chief of Detectives
or Deputy Commissioner of BCP would have constituted a
promotion. Pollock alleges that Chief of Detectives is among the
five highest-ranking leadership positions within the NYPD, and
that a woman has never had an opportunity to compete for the
position in the NYPD's 175-year history. SAC ¶¶ 81, 159-60, 206.
Pollock also alleges that Shea, after serving as Chief of Crime
Control Strategies—Pollock's role before the reorganization—
advanced to Chief of Detectives before becoming the Police
Commissioner. SAC ¶ 99. While Pollock is not necessarily
entitled to follow this trajectory, Shea's career path supports
Pollock's contention that Chief of Detectives has more prestige
and authority than Chief of Crime Control Strategies, and that
Chief of Detectives is viewed as a stepping-stone to the NYPD's
highest position.

Similarly, Pollock has plausibly alleged that appointment
to the new role of Deputy Commissioner of BCP would have
constituted a promotion. Pollock alleges that Parker, the Deputy
Commissioner of BCP, reports directly to the Commissioner and
oversees three subordinate commands, two of which were led by

three-star chiefs prior to Pollock's departure. SAC ¶¶ 117, 240-48, 259. The defendants cite Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) in arguing that Pollock was merely denied a lateral transfer as opposed to a promotion, but that case is inapposite. The plaintiff there complained about not receiving a transfer to a position that "actually paid less than, and organizationally was a demotion from, the [] position she held when she requested the transfer." Id. The Chief of Detectives and Deputy Commissioner of BCP roles plainly would not have been demotions for Pollock.

With regard to Pollock's alleged demotion, the Court of Appeals for the Second Circuit has stated that "[a] lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y., 310 F.3d 43, 51 (2d Cir. 2002). Here, Pollock alleges that her transfer led to a reduction in her staff (from overseeing a staff of over 300 to a staff of nine), as well as a decrease in management responsibilities and prestige. SAC ¶ 123, 234, 247, 254-56. At this stage, "the court must assume the factual allegations in the complaint to be true." Vega, 801 F.3d at 86. Therefore, Pollock has plausibly

alleged that she was demoted when she was assigned to the position of Chief of Collaborative Policing.

Accordingly, Pollock has sufficiently alleged that she was subjected to two adverse employment actions: the defendants' failure to promote her to either Chief of Detectives or Deputy Commissioner of BCP, and her demotion to Chief of Collaborative Policing.

Pollock has also satisfied the fourth and final prong of her burden at the motion to dismiss stage because, with respect to her failure to promote claim and her demotion claim, she has pleaded sufficient facts to establish "at least minimal support for the proposition that the employer was motivated by discriminatory intent." Littlejohn, 795 F.3d at 311. "[A]t the 12(b)(6) stage of a Title VII suit, allegation of facts supporting a minimal plausible inference of discriminatory intent suffices as to this element of the claim[.]" Doe v. Columbia Univ., 831 F.3d 46, 55 (2d Cir. 2016). Indeed, the Court of Appeals for the Second Circuit has "often vacated 12(b)(6) and 12(c) dismissals of complaints alleging discrimination" and has "cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." Id. at 55 n.8.

An inference of discrimination may be supported at this stage by showing more favorable treatment of an employee not in

the plaintiff's protected class. See Littlejohn, 795 F.3d at 312-13 ("[A]n inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."); Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 271 (E.D.N.Y. 2013) (collecting failure to promote cases holding that an inference of discrimination arises when "the position was filled by an individual who was not a member of the plaintiff's protected class"). Pollock alleges that a man was appointed to replace her as Chief of Crime Control Strategies. SAC ¶ 174. Pollock also alleges that men were promoted to Chief of Detectives and Deputy Commissioner of BCP instead of her. SAC ¶¶ 116, 202. Therefore, Pollock's Complaint supports at least a minimal plausible inference of discriminatory intent, satisfying her burden at this stage.

The defendants argue that Pollock's Complaint does not raise an inference of discrimination because Pollock has not shown that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the [plaintiff] for the job in question." ECF No. 29, at 10 (quoting Abraham v. N.Y.C. Dep't of Educ., 398 F. App'x 633, 635 (2d Cir. 2010)). But the defendants overstate Pollock's burden at this stage. It is sufficient to

raise a minimal inference of discrimination that a man replaced Pollock as the Chief of Crime Control Strategies, and that men were chosen over Pollock for the positions of Chief of Detectives and Deputy Commissioner of BCP. Because Pollock does not need to show at this stage that she was more qualified than the men who received more favorable treatment than her, the qualifications of those men are irrelevant. Therefore, the defendants are wrong to argue that Pollock was required to plead facts regarding the qualifications of Parker and Harrison.

Indeed, in Littlejohn, the Second Circuit Court of Appeals rejected the same argument that the defendants advance here. The court there concluded that the plaintiff did not need to allege that her qualifications were "so superior" to those of the employee who replaced her because, "[a]t the prima facie stage, 'the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination.'" Littlejohn, 795 F.3d at 313 n.11 (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)). Abraham, the case cited by the defendants, is inapposite because the defendant there, at the summary judgment stage, had already "proffered legitimate, non-discriminatory reasons for declining to promote [the plaintiff]," shifting the burden back to the plaintiff to show that the defendant's

proffered reasons were merely pretext for discrimination. See 398 F. App'x at 635.

In an effort to rebut any inference of discrimination against Pollock, the defendants highlight several recent appointments of women to some of the NYPD's highest ranks. The defendants argue that "these promotions demonstrate the NYPD and Commissioner Shea's commitment to ensuring that women in the NYPD are provided with equal promotional opportunities." ECF No. 29, at 12. Even if this evidence could be considered at the motion to dismiss stage—despite it not being relied upon in the Complaint, see Chambers, 282 F.3d at 153—it is irrelevant. First, most of the promotions cited by the defendants occurred after Pollock filed her Complaint in this case. Second, the Complaint alleges sufficient facts to raise a minimal inference of discrimination against Pollock; that inference cannot be rebutted by the defendants' treatment of other women in other positions.

Conversely, Pollock seeks to bolster an inference of discrimination by pointing to a "pattern or practice" of discrimination by the defendants against women employees. See, e.g., ECF No. 30, at 7, 10. While Pollock may rely on evidence that the defendants engaged in a pattern or practice of discrimination—"in the ordinary sense of those words"—to support her discrimination claim, it should be clarified that non-class

private plaintiffs such as Pollock cannot rely on the pattern-or-practice method of proof that is available to governmental and class-action plaintiffs in Title VII litigation. See Chin v. Port Authority of N.Y. & N.J., 685 F.3d 135, 147-50 (2d Cir. 2012). This means that Pollock cannot use evidence of a pattern or practice of discrimination to shift the burden to the defendants to prove that they did not discriminate against Pollock. See id. at 149. Rather, in accordance with settled law under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Pollock has met her burden of plausibly alleging that she was subjected to an adverse employment action. Pollock also has pleaded facts sufficient to support a minimal inference of discrimination. Accordingly, Pollock has satisfied the "reduced prima facie requirements that arise under McDonnell Douglas in the initial phase of a litigation." Littlejohn, 795 F.3d at 312. The defendants' motion to dismiss Pollock's employment discrimination claim under Title VII is **denied.**

## IV.

The defendants have also moved to dismiss Pollock's discrimination claims under the NYCHRL against the City and against Shea in his individual and official capacities.

The NYCHRL makes it unlawful for "an employer or an employee or agent thereof, because of the . . . gender . . . of any person: (1) [t]o represent that any employment or position is not available when in fact it is available; (2) [t]o refuse to hire or employ or to bar or to discharge from employment such person; or (3) [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

Under the NYCHRL, individual employees can be held personally liable if the employee participates in the conduct giving rise to the discrimination. See Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009); see also Stryker v. HSBC Sec. (USA), No. 16-CV-9424, 2020 WL 5127461, at *16 (S.D.N.Y. Aug. 31, 2020). Further, an "employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of [the relevant provisions] of this section [] where . . . the employee or agent exercised managerial or supervisory responsibility." N.Y.C. Admin. Code § 8-107(13)(b).

"The NYCHRL uses the same framework as Title VII and the NYSHRL, but contains, as to some elements, more liberal pleading and proof standards." Farmer v. Shake Shack Enters., LLC, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020). If a plaintiff "has adequately pled sex-discrimination claims under Title VII . . . her similar claim under the broader NYCHRL also necessarily survives." Id. Therefore, for substantially the same reasons that Pollock has pleaded a claim against the City for employment discrimination in violation of Title VII, Pollock has pleaded facts sufficient to support her NYCHRL claim against the City.

With respect to Pollock's claim against Shea in his individual capacity, it is plain that Shea can be held liable under the NYCHRL because he participated in the conduct giving rise to the discrimination claim. See Xiang v. Eagle Enters., LLC, No. 19-CV-1752, 2020 WL 248941, at *6 (S.D.N.Y. Jan. 16, 2020). Moreover, the City can be held vicariously liable for Shea's actions because Shea was exercising managerial or supervisory authority at the time of the alleged discriminatory acts. See Zakrzewska v. New Sch., 928 N.E.2d 1035, 1039 (N.Y. 2010); Antoine v. Brooklyn Maids 26, Inc., 489 F. Supp. 3d 68, 89 (E.D.N.Y. 2020).

Finally, Pollock argues that pattern-or-practice claims are recognized under the NYCHRL. But, as stated, an individual plaintiff's reliance on the pattern-or-practice method of proof

is foreclosed by the Second Circuit Court of Appeals' decision in Chin. Pollock cites a 2006 New York State Supreme Court case that allowed an individual's pattern-or-practice claim to proceed, but that case predates Chin by six years. Pollock points to no post-Chin authority authorizing such a claim, and it appears that there is none. Moreover, in the case Pollock cites, Quinn v. JPMorgan Chase & Co., No. 116046/2003, 2006 WL 1440876 (N.Y. Sup. Ct. 2006), the court appears to have been persuaded by: (1) the Second Circuit Court of Appeals' silence on the question; (2) the absence of authority explaining why an individual plaintiff cannot recover under a pattern-or-practice theory; and (3) the fact that no district court in the Second Circuit had dismissed a pattern-or-practice claim "solely because it was brought by an individual." See id. at *7-8. None of that is true anymore.

Chin explicitly held that private, non-class plaintiffs cannot bring pattern-or-practice claims. The court reasoned that this method of proof is at odds with the plaintiff's ultimate burden of persuasion under the McDonnell Douglas framework. See Chin, 685 F.3d at 149-50. That reasoning is also persuasive in the NYCHRL context because NYCHRL plaintiffs, like Title VII plaintiffs, carry the ultimate burden of proving discrimination, even if the burden is a lower one. See Hamburg v. N.Y. Univ. Sch. of Med., 62 N.Y.S.3d 26, 32-33 (App. Div. 2017). Finally,

in light of Chin, there are now district court decisions in this Circuit dismissing pattern-or-practice claims solely because they were brought by individuals. See, e.g., Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 390-91 (S.D.N.Y. 2014).

Accordingly, Pollock cannot pursue a pattern-or-practice claim under the NYCHRL, but Pollock has pleaded sufficient facts to allege discrimination under the NYCHRL.

### V.

The defendants also move to dismiss Pollock's Title VII and NYCHRL constructive discharge claims. The defendants argue that these claims are based entirely on Pollock's dissatisfaction with her changed position and Pollock's view that she did not have further advancement opportunities within the NYPD. The defendants argue that these grievances fall far short of the demanding standard for constructive discharge.

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996). For purposes of Title VII, a constructive discharge occurs when "working conditions become so intolerable that a reasonable

person in the employee's position would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 141 (2004). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." Green v. Brennan, 578 U.S. 547, 555 (2016).

The NYCHRL similarly makes it unlawful "[f]or an employer or an employee or agent thereof, because of the . . . gender . . . of any person . . . to discharge from employment such person." N.Y.C. Admin. Code § 8-107(1)(a). Pollock argues that the standard for establishing a constructive discharge under the NYCHRL is more lenient than the standard under Title VII. She cites cases noting that "appellate courts have not yet explored the contours of a constructive discharge claim using the enhanced liberal construction analysis of the City Human Rights Law." Golston-Green v. City of N.Y., 123 N.Y.S.3d 656, 671 n.4 (App. Div. 2020); see also Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 981 N.Y.S.2d 89, 92 n.1 (App. Div. 2014) ("[I]t should not be assumed that the standards for establishing constructive discharge under the City HRL are the same as have been set forth for title VII[.]").

But the standard for constructive discharge—even under the NYCHRL—is demanding. The Appellate Division of the New York State Supreme Court has held in numerous recent cases that a constructive discharge for purposes of the NYCHRL only occurs

when an employer "deliberately create[s] working conditions so intolerable that a reasonable person in the plaintiff's position would have felt compelled to resign." Golston-Green, 123 N.Y.S.3d at 671; see also Crookendale v. N.Y.C. Health & Hosps. Corp., 107 N.Y.S.3d 282, 283 (App. Div. 2019) (same).

In support of her constructive discharge claim, Pollock describes the reorganization that denied her desired positions and left her reporting to a male civilian. However, dissatisfaction with a job assignment does not establish a constructive discharge under Title VII or the NYCHRL. See Petrosino, 385 F.3d at 231 (Title VII); Golston-Green, 123 N.Y.S.3d at 672 (NYCHRL); see also Zaborowski v. Roman Cath. Diocese of Brooklyn, 145 N.Y.S.3d 847, 848 (App. Div. 2021) (citing Morris v. Schroder Cap. Mgmt. Int'l, 859 N.E.2d 503, 507 (N.Y. 2006)).

Pollock further alleges three instances of male supervisors being disrespectful or disparaging toward her in November and December 2019: namely, Shea looking at his phone during Pollock's presentation at a transition meeting, Shea asking Pollock "how [she liked] it at the other end of the table" in the wake of the alleged demotion, and Parker—Pollock's newly-installed superior—asking Pollock to perform clerical duties that are better suited to an assistant than a three-star police chief. While offensive, these occurrences do not evince the

intentional creation of a workplace so intolerable that a reasonable person in Pollock's position would have felt compelled to resign. See, e.g., La Porta v. Alacra, Inc., 38 N.Y.S.3d 20, 22 (App. Div. 2016) (no constructive discharge under NYCHRL when employer deliberately failed to take action in response to sexual harassment, plaintiff reasonably feared further harassment, and plaintiff suffered relapse of stress-variable autoimmune disorder); Short v. Deutsche Bank Sec., Inc., 913 N.Y.S.2d 64, 66 (App. Div. 2010) (no constructive discharge under NYCHRL when plaintiff was subjected to unfair criticism, work reassignment, ignored by her supervisor, and given a bonus lower than male employees); Wright v. Goldman, Sachs & Co., 387 F. Supp. 2d 314, 320-22, 326 (S.D.N.Y. 2005) (no constructive discharge under Title VII when plaintiff was, among other things, denied a request to transfer, denied overtime, denied use of an internet-based work processing system that other employees used, and had some of his work product deleted); Lehman v. Bergmann Assocs., Inc., 11 F. Supp. 3d 408, 415 (W.D.N.Y. 2014) (no constructive discharge under Title VII when plaintiff was forced to take a less prestigious position, awarded a lower bonus, and ostracized from important corporate decisions).

In this case, despite being unsatisfied with her transfer, Pollock retained her three-star rank and salary. Moreover, in

the timeframe around Pollock's transfer, Shea made remarks indicating that he understood Pollock's frustration and hoped that she would remain at the NYPD. While the episodes Pollock alleges are inappropriate, they do not constitute the sort of intentionally oppressive working conditions that courts have found necessary to establish a constructive discharge under either Title VII or the NYCHRL. There is no reasonable reading of Title VII or the NYCHRL under which the working conditions Pollock alleges were so intolerable as to be tantamount to a firing.[2]

Pollock has not alleged sufficient facts to state a claim for constructive discharge under either Title VII or the NYCHRL. The Court need not decide if the two constructive discharge standards differ (and if so, to what extent) because Pollock's allegations plainly fail to state a claim under either standard. See Tulino v. City of N.Y., 813 F. App'x 725, 727 n.2 (2d Cir. 2020) (noting that the NYCHRL constructive discharge standard seems to mirror the federal standard, but declining to "decide the question of the proper standard for constructive discharge

---

[2] Pollock argues that her transfer to Chief of Collaborative Policing, by itself, is sufficient to establish a constructive discharge under the NYCHRL, but the unreported decision she cites for that proposition does not even involve a claim of construction discharge. See ECF No. 30, at 21 (citing Quinn v. JPMorgan Chase & Co., 2006 WL 1440876). Pollock also cites the legislative history of the NYCHRL and cases that call generally for broad constructions of the NYCHRL in favor of discrimination plaintiffs. See ECF No. 30, at 17-21. But these sources do not address constructive discharge claims in particular. Therefore, the broad interpretive framework that Pollock urges would only be relevant if the application of the constructive discharge standard to Pollock's allegations was ambiguous-but it is not.

under the NYCHRL" because the plaintiff's claim failed under any standard she proposed). Accordingly, the defendants' motion to dismiss Pollock's constructive discharge claims is **granted**.

## CONCLUSION

Because Pollock has sufficiently pleaded facts to support her claims of employment discrimination in violation of Title VII and the NYCHRL, the defendants' motion to dismiss Pollock's discrimination claims is **denied**. And because Pollock has failed to allege that the defendants intentionally created a workplace so intolerable that any reasonable person in her position would have resigned, the defendants' motion to dismiss Pollock's constructive discharge claims under Title VII and the NYCHRL is **granted**.

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

For the foregoing reasons, the defendants' motion to dismiss is **granted in part and denied in part**. The Clerk of the Court is directed to close Docket Nos. 28 and 32.

**SO ORDERED.**

Dated:     **New York, New York**
           **October 26, 2021**

_____
John G. Koeltl
United States District Judge